against the premises and with respect to the encroachments, it cannot, in view of the provisions of the contract, be held as matter of law that the defendants fully performed the contract on their part by tendering a marketable title free from all liens and incumbrances, and therefore a new trial must be granted.

The judgment should therefore be reversed and a new trial granted, with costs to appellants to abide the event.

.INGRAHAM, McLAUGHLIN, and HOUGHTON, JJ., concur. CLARKE, J., dissents.

_____

WALTER et al. v. FRANK et al.

(Supreme Court, Appellate Division, First Department. June 18, 1909.)

1. WILLS (§ 489*)—CONSTRUCTION—DESIGNATION OF DEVISEES—EVIDENCE.

   In an action to construe a will, evidence *held* to identify the "Art Museum of the City of San Francisco" to which testator left his paintings and other works of art with the "San Francisco Art Association," rather than the "Golden Gate Park Museum"; there being no museum in existence bearing the name used in the will, and there having been no such museum in existence.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 1044; Dec. Dig. § 489.*]

2. PERPETUITIES (§ 6*)—SUSPENSION OF ALIENATION—MEASURE OF TERM.

   A trust created by will for the benefit of needy relatives of testator for the period of 50 years from testator's death is invalid, not being measured by lives.

   [Ed. Note.—For other cases, see Perpetuities, Cent. Dig. § 33; Dec. Dig. § 6.*]

3. WILLS (§ 865*)—EFFECT OF INVALIDITY—PERSONS INHERITING.

   Testator bequeathed the remainder of his estate after making a number of specific bequests to his executors and trustees to be held in trust by them for 50 years, and to use the income so far as necessary to aid in the support of "my needy kin of the first six degrees," and directed, at the expiration of 50 years from the time of his death, that the total amount of the fund should be divided "among all the members of my kin up to and inclusive of the sixth degree of kinship, in equal parts, share and share alike." *Held*, the trust established by the law being invalid, that that portion of his estate impressed within the trust cannot be disposed of according to testator's wishes, and that as to such part of his estate he died intestate.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 2188; Dec. Dig. § 865.*]

4. EXECUTORS AND ADMINISTRATORS (§ 47*)—ASSETS—LEGACIES.

   Testator bequeathed a specified amount to a person named, to be by him divided among needy relatives of his mother, and he survived testator, but died before the legacy was paid, and his personal representatives signified their willingness to disburse the amount in accordance with the testator's purpose. *Held*, that legacy should be paid to the executors of the deceased legatee.

   [Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 298; Dec. Dig. § 47.*]

_____

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

**5. WILLS (§ 408\*)—ACTIONS TO CONSTRUE WILLS—FEES AND COSTS.**

Under Code Civ. Proc. § 3253, providing for an additional allowance to parties in certain proceedings, an allowance to defendants in addition to costs cannot be made in an action for the construction of a will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 886; Dec. Dig. § 408.\*]

Appeal from Special Term, New York County.

Action by Moritz Walter and another against Mary Frank and others for the construction of a will. Judgment for plaintiffs, and certain defendants appeal. Affirmed.

On the hearing at Special Term, Bischoff, J., filed the following opinion:

Construction is sought as to three independent provisions of the will of Emanuel Walter, deceased, the matter in controversy being contained in the twenty-eighth, forty-second, and forty-third clauses.

It appears that the testator, who was unmarried, resided in the City of San Francisco, Cal., during all the years of his active business life; that he amassed a substantial fortune, and in the year 1894 he left San Francisco, never to return; that he was a native of Germany, and during the interval between his departure from San Francisco and his death, in 1905, he spent much of his time in Europe accumulating a collection of works of art, the subject of the bequest contained in the forty-second clause of his will, which reads as follows:

"Forty-Second: I hereby order and direct that my executors shall cause to have all my pictures, paintings, aquarelles, etchings, ivories, bric-a-brac and works of act, wherever found or situate, to be sent to San Francisco, California. The expenses for packing and for transportation of the same to said city of San Francisco shall be paid from my estate. The whole collection of these articles shall be designated and be known by the name of 'The Emanuel Walter Art Collection' and shall be delivered by my executors to the Art Museum of the city of San Francisco, California, and become the property of said art museum forever. This collection shall be kept in a suitable room or in suitable rooms connected with such art museum, and such room or such rooms shall be known and designated 'The Emanuel Walter Art Collection.'

"For the purpose of providing such a suitable room or suitable rooms, and to keep them in good repair, I hereby give and bequeath to said art museum the sum of fifty thousand dollars ($50,000.00).

"If in the judgment of my executors and trustees it would be advisable to have my nephew Edgar Walter act as superintendent or director of said 'Emanuel Walter Art Collection,' and should he be willing to so act, then I hereby order and direct that my executors and trustees shall invest the sum of fifty thousand dollars ($50,000.00) in first-class securities, and the accruing interest of such fund shall be paid to said Edgar Walter as a salary for his services as such superintendent or director, in annual installments. Should said Edgar Walter, however, resign as such superintendent or director, or for any reason become disqualified to serve, then this amount of fifty thousand dollars ($50,000) shall revert to my estate and shall be disposed of in the same manner as hereinafter provided with reference to the rest, residue and remainder of my estate."

Neither at the time when the will was executed in the year 1904 nor at any time was there an association or corporation named the "Art Museum of the City of San Francisco, California," and the issue presented is whether the testator had reference to the "San Francisco Art Association," an organization affiliated with the Regents of the University of California, and constituting the "Mark Hopkins Institute of Art," or whether he intended to describe as the legatee the city of San Francisco, which conducted a museum of applied arts, known as the "Golden Gate Park Museum." In March, 1894, when the testator left San Francisco, the Park Museum had not actually come into existence. The building which it subsequently occupied was one

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the buildings designed for the "Mid-winter Exhibition" of 1894; and. while the testator visited the exposition and this particular building among others, there is nothing to indicate that he actually knew of the project— developing after the exposition closed and a surplus of the funds was found —to establish a permanent museum of applied arts at this place. On the other hand, the San Francisco Art Association had an established institution for the exhibition of the fine arts, and controlled a very large and well-known building donated for the purpose. Close relatives of the testator were members of the association, and he himself had often attended at its rooms. His nephew Edgar Walter—designated by the will to act as superintendent of the collection—had obtained his technical training as a sculptor in the Mark Hopkins Institute of Art, the school affiliated with the Art Association, and while assisting the testator in the collection of these works of art in Europe, during five or six summers, had often spoken of the Art Association where specimens of his work as a sculptor were exhibited with mention of their merits in a pamphlet issued by the association and which the testator had seen and commented upon.

It would thus appear that the only institution actually meeting the description of an "Art Museum" in San Francisco at the time when the testator left that city was the San Francisco Art Association, and that this was the legatee which he had in mind is, I think, rendered quite clear by the naming of his nephew Edgar, for whom he evidently had much affectionate regard, as superintendent or custodian of the collection. Edgar Walter's interest in the Art Association was well known to the testator. They had been in close companionship in the work of making a collection, and it does violence to the probabilities to assume that the testator would have named this nephew to take charge of the display of that collection in some other institution more or less in rivalry. The testimony of Mr. De Young, called as a witness for the city of San Francisco, has been so far infirmed, intrinsically, by the circumstances to which the witness referred, that I cannot give it much weight. This witness, who had been an active and, indeed, the prime mover in establishing the "Golden Gate Park Museum," testified that he knew the testator; that in a conversation had with him relative to the witness' collection of ivories Mr. Walter had said that he himself had some fine specimens of ivories which he had picked up; and that some day he would give them to "your museum." The ivories thus seen by Mr. Walter, however, were on exhibition at the rooms at the Art Association, and the conversation must have had reference to this exhibit, since the testator was never in San Francisco after Mr. De Young's ivories were placed in the Park Museum. Hence, in the absence of any actual proof that Mr. Walter knew of the projected Park Museum, or of Mr. De Young's connection with it, the words used by him would appear to relate to the Art Association rather than to the Park Museum. But, on cross-examination, the witness became more explicit and gave testimony which, if acceptable, would point directly to an intention on the part of the testator to benefit the Park Museum. This testimony was: "He (testator) opened the conversation by saying: 'That is a fine museum you have out in the park. I enjoyed very much visiting it. I see you have been working at your fad on ivories. You have quite a nice collection of them.' He then remarked: 'You have a very fine collection of ivories in your own house—so have I.' As far as I can recollect he then added: 'I intend some day to give my curios and ivories to your museum.'" Now, it was impossible for the testator to have visited the Park Museum, because he left San Francisco before it was opened. And yet the witness testified that this conversation was had on one of the testator's "return visits" to San Francisco after 1894, visits which, in fact, were never made. The witness' subsequent withdrawal of his statement that the place of the conversation was San Francisco necessarily takes all force from the proof that is offered to show the testator's knowledge of the Park Museum and his intention to make some disposal of his collection in its favor; and it appears from the testimony of Edgar Walter that at no time during his close association with the testator after the latter's departure from San Francisco and during all the years devoted to making the collection of paintings was any word spoken by Mr. Walter indicating that he knew about the Park Museum at all. As the

proof stands, I am impressed with the fact that the testator had in mind, when making his will, the only place of art exhibition in San Francisco (satisfying the artist's use of the word "museum") which was well established in 1904, and with which he was familiar and his family identified, and that the words "of the city of San Francisco," which are equally suggestive of location or ownership, and were used in the sense of location merely. The circumstances all point to this intention, and, indeed, so far as he named the person to take charge of the exhibit beyond the power of the legatee to remove or replace, the will could not have been fully carried out, for this condition the city of San Francisco had no lawful authority to meet.

As to the forty-second clause of this will, therefore, my construction is that the words "Art Museum of the City of San Francisco" described the "San Francisco Art Association," conducting the Mark Hopkins Institute of Art.

The provisions of paragraph forty-third as to which construction is sought are as follows:

"All the rest, residue and remainder of my estate, real, personal and mixed, of whatsoever nature and wheresoever situated, I give and bequeath to my executors and trustees, in trust for the following uses, intents and purposes: The proceeds of the sales of all this rest, residue and remainder of my estate shall be invested in first-class securities, and the interest derived therefrom shall be used by my executors and trustees for the support, if necessary, and in aiding any of my needy kin of the first six degrees, provided that, in the sole discretion and judgment of my executors and trustees, such action is advisable. Any and all of the accruing interest not so expended by my executors and trustees shall become a part of the principal. It is, however, provided that the trust hereby created shall cease after the expiration of fifty (50) years from the time of my death, and then the total amount of the principal and the accrued interest shall be divided among all the members of my kin, up to and inclusive of the sixth degree of kinship, in equal parts, share and share alike, for the own use, benefit and behoof of these respective kinfolk forever."

The 50-year limitation of the trust, not being measured by lives, operates to render the trust itself invalid and unenforceable. This proposition needs no argument as the parties concede, and the question for discussion is whether the devise and bequest to "all the members of my kin up to and inclusive of the sixth degree" of kinship in equal parts" may be upheld, and the estate be taken to vest in them at the testator's death, eliminating the invalid limitation of years to which the distribution was postponed. In my view, this result would be violative of settled principles of testamentary construction; it being apparent that the 50-year limitation and a distribution at the expiration of that period were integral parts of a complete scheme for the disposal of the residuary estate.

In the case of Central Trust Company v. Egleston, 185 N. Y. 23, 28, 33, 77 N. E. 989, 991, 992, it was said: "It is the very plain duty of the courts to find out what a testator has meant to do with his property after his death, and, then, if it be possible to give his plan effect by a construction which will validate it, to do so, but the court cannot make a new will for him; nor should it be expected to resolve into lawfulness of disposition some tangle of desire to provide for future contingencies. The inquiry, in each case, must be what provisions has the testator intended to make for the disposition of his estate and not whether he intended to dispose of his estate according to the statutory rules governing testamentary dispositions. When the provisions are ascertained and understood, then is their legality to be determined." And again: "Nor can it be successfully argued that such (invalid) provisions of the will may be lopped off without prejudice to the testator's plans. The question is, as I had before suggested, what provisions the testator intended to make and to determine their validity as made. As it was observed by Judge Martin, in Herzog v. Title Guarantee & Trust Co., 177 N. Y. 86, 69 N. E. 283, 67 L. R. A. 146: 'The intent to be discovered is not whether he intended to make a valid disposition of his estate, but what provisions he in fact intended to make. When that is found it is for the court to determine whether such intended provisions are valid or otherwise. * * * The duty of the court is

to interpret, not to construct.'" In Tilden v. Green, 130 N. Y. 29, 51, 28 N. E. 880, 884, 14 L. R. A. 33, 27 Am. St. Rep. 487, after a discussion of the authorities, the court said: "The result of these and other cases is that in applying the rule invoked by the appellants, which permits unlawful trusts to be eliminated from the will and those that are lawful to be enforced, we must not violate the intention of the testator, or destroy the scheme that he has created for the disposition of his property. We may enforce and effectuate his will and give full effect to his intent, provided it does not violate any cardinal rule of law, but we cannot make a new will or build up a scheme for the purpose of carrying out what might be thought wise or would be in accordance with his wishes." Where invalid provisions have been eliminated from a will, and the devise or bequest so far as valid upheld,' the result has always been reached with due regard to this rule. Kalish v. Kalish, 166 N. Y. 368, 59 N. E. 917, was a case of an attempted unlawful suspension which could be cut out and still leave the substantial disposal of the property unaffected, and the court said: "Here we are not required to make a new will for the testator. We have a valid life estate, followed by a void intermediate trust for five years, succeeded by a valid ultimate trust and good remainders. The void intermediate trust is for the benefit of the same legatees who take under the ultimate trust and remainders, respectively. The excision of the void trust simply gives immediate effect to those ulterior devises which under it were to be postponed for five years. The same persons take in the same proportions as before." In Smith v. Chesebrough, 176 N. Y. 317, 68 N. E. 625, the doctrine of acceleration was applied to an invalid postponement of two years, and the intermediate transfer to the designated takers (whose interests were vested, subject only to the postponement) was decreed; the court saying: "By taking out of the codicil the invalid provision for postponement, the only change in the testator's plan for the disposition of his residuary estate is that the physical possession of the remainder is accelerated so as to take effect upon the testator's death instead of two years later. In all other respects the testamentary scheme is not only essentially, but literally, preserved."

It is quite plain from the language employed by the testator that the assistance of his "needy kin" for 50 years was the main purpose for this residuary provision, in furtherance of which purpose he provided for the increase of the principal fund by the addition of income not presently required—a future and possibly more needy generation to benefit by the increase which would thus result. To eliminate this provision and to direct that the residuary estate should be enjoyed immediately by the persons who now answer the description of "kin up to and inclusive of the sixth degree of kinship" would so materially change the intended result as to amount to the reconstruction of the will. Again, the persons to enjoy the income were not kin to the sixth degree, but only "needy kin." Thus to accelerate the position would be to give to the remaindermen a benefit which the testator never intended them to have in any possible aspect, and it would also appear that the present kin to the sixth degree were not the remaindermen whom the testator had in mind. True, in legal acceptance, a man's kin for the purposes of succession are those who are found at his death, but I think it must be held that, as the testator used the term, it was applied in a more general sense and described his relatives who would answer the description of kin to the sixth degree at the end of the fifty years' period. He says in his will: "The trusts hereby created shall cease after the expiration of fifty years from the time of my death, and then the total amount of the principal and accrued interest shall be divided among all the members of my kin up to and inclusive of the sixth degree of kinship." These words evidently referred to a class of persons to be determined in the future, not to the mere future enjoyment by a presently known class, and it is impossible to find any other meaning without straining the language used to the verge of absurdity. While the law favors a construction which would avoid intestacy, this does not mean the law may presume the testator's knowledge that he has made a faulty will, and construe the words as used with a view to save the fragments of the testamentary rights after an expected successful onslaught upon its solemn provisions.

The testator's intention, as expressed in the forty-third paragraph, is not open to doubt, and, since the residuary estate cannot lawfully be disposed of

upon a construction of the will which would be in substantial harmony with that intention, I must hold that, so far, he died intestate.

The twenty-eighth paragraph of the will contained a bequest as follows:

"Twenty-Eight: I hereby give and bequeath to Max Hessberg, of the firm of Knauth, Nachod & Kuehne, of New York City, the sum of five thousand dollars ($5,000.00) for the purpose of dividing the same among such needy relatives, on her parental side, of my deceased mother Rosa Walter, née Hessberg, late of Reckendorf, Bavaria, as he in his discretion and judgment may select."

Max Hessberg, the legatee named, survived the testator, but has since died, and the plaintiffs seek a direction in the matter of paying the legacy to his personal representatives, who have signified their willingness and intention to disburse the amount in accordance with the purpose intended by the testator. Certainly the words used did not create a trust, and the right of the legatee to receive or hold the legacy was not made conditional upon the continuation of his life until the amount was disbursed by him, nor upon the willingness of his executors so to disburse it. Since he was living when the will became effective, the legacy did not abate, and the fact that he has died does not really affect the question; for, if the legatee was entitled to the legacy, then his personal representatives may, of course, take it. The only theory upon which the payment of this legacy could be withheld would be that the testator intended to create an express trust void in law, but no such contention is made by any of the parties, and the words of this clause, as to the legatee's payment over to persons whom he may select in his discretion from among the members of a certain class, import an intention not to create a trust. Harper v. Phelps, 21 Conn. 257–269; 2 Story, Eq. Jud. §§ 1070, 1071; Howard v. Carusi, 109 U. S. 725, 3 Sup. Ct. 575, 27 L. Ed. 1089.

The legacy provided for in the twenty-eighth clause should, therefore, be paid to the defendants Sommerich, Hessberg and Wolf, as executors of Max Hessberg, deceased. Proposed findings and judgment may be submitted in accordance with this opinion upon notice of settlement.

Bischoff, J., also filed an opinion upon application for an allowance, as follows:

As I have had occasion to rule in Hafner v. Hafner, 34 Misc. Rep. 99, 69 N. Y. Supp. 460, allowances to defendants, in addition to costs, under section 3253 of the Code of Civil Procedure, cannot be made in an action for the construction of a will. This situation results from the framing of sections 3252 and 3253, which are similar to the corresponding provisions of sections 308 and 309 of the Code of Civil Procedure, as construed in Downing v. Marshall, 37 N. Y. 380. Such slight changes of phraseology as have occurred in these provisions do not affect the force of Downing v. Marshall as an authority (Re Holden, 126 N. Y. 589, 27 N. E. 1063), and the case of Allen v. Stevens, 161 N. Y. 123, 55 N. E. 568, cannot well be viewed as supporting a different rule. True, in that case the court assumed that there was power in the court below to grant advances to the defendants, but the question was not presented for discussion, since it appears that each party who appealed from the allowance to the other had an allowance to protect for his own part, and the quantum only was the subject of the appeal, not the power to make an allowance, which power the parties evidently conceded in their common interest. The guardian ad litem for one of the defendants has rendered services of a substantial character, and an allowance for his services should certainly be awarded to him if the court had the power to do so. If additional allowances could be made to defendants in the action under section 3253 of the Code of Civil Procedure, it would appear that the infant defendant could properly be granted an allowance in addition to costs, like any other defendant represented by counsel in the litigation. Such an allowance, when awarded, would be of the character of the "taxed costs" by which a guardian ad litem's compensation may be measured (Re Robinson, 40 App. Div. 30, 33, 57 N. Y. Supp. 523), and is to be distinguished from a general award to the guardian—without the scope of section 3253, and made from a fund not actually belonging to the infant—as in Doremus v. Crosby, 66 Hun, 125, sub nom. Doremus v. Doremus, 20 N. Y. Supp. 906, and in the cases therein referred to. The distinction is noted in

Re Robinson, supra, after a review of the authorities including the case of Doremus v. Crosby, and there would appear to be no proper theory upon which an infant party is to be excluded from the benefit of section 3253 where an adult defendant similarly situated would receive an additional allowance under that section because of his appearance and participation in litigation to which he has been joined, to the end that the proper disposal of a fund before the court may be made with a joinder of all necessary parties. Where the situation is such that a party defendant, if an adult, would be granted from the fund in suit an allowance in addition to costs under section 3253, the policy of the law would certainly not require that, because of infancy, compensation for the services of counsel must be withheld, or, which is the same thing, deducted from the infant's own particular share in the fund. The unfairness to the infant of such a result is obvious, and it is certainly uncalled for upon what appears to me to be the proper reading of the authorities in connection with the apparent meaning of section 3253 of the Code. Were this a case other than for the construction of a will, therefore, I could properly grant a statutory allowance to this infant defendant, as in the case of others, but in view of the rule stated in Hafner v. Hafner, supra, no allowance may be made other than to the plaintiffs, and, since the infant has no interest in a fund from which compensation to the guardian for necessary services may be directed to be made, the court can find no means of providing that compensation in the judgment be entered.

Decision and judgment signed.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN, CLARKE, and HOUGHTON, JJ.

Rose & Putzel, for appellants Frank and Hessberg.

Emil Goldmark, guardian ad litem for appellant Bruckner.

Wolf & Kohn, for appellant Backhaus.

S. B. Livingston, for appellants City of San Francisco and others.

Kurzman & Frankenheimer, for respondents Walter.

Joseph D. Redding, for respondents Regents of University of California and others.

PER CURIAM. Judgment affirmed, with costs to all parties who appeared separately and filed briefs on this appeal, payable out of the estate, on opinion of the court below.

Order filed.

---

(133 App. Div. 617.)

### JACOBS v. SIRE.

(Supreme Court, Appellate Division, First Department. July 13, 1909.)

1. LANDLORD AND TENANT (§ 63*)—ASSIGNMENT OF LEASE—TITLE OF ASSIGNOR —ESTOPPEL OF ASSIGNEE.

Where, at the time a lease was assigned, the assignor was in possession of the premises under a claim that he had an oral lease for one year which he had successfully established in dispossess proceedings by trustees of the owners, and the assignee obtained possession from him by virtue of the assignment and remained in possession during the balance of the term, he was estopped from questioning the assignor's title.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 172; Dec. Dig. § 63.*]

2. MONEY RECEIVED (§ 6*)—CONSIDERATION.

Where a person in possession of premises who had established his claim of an oral lease thereof in dispossess proceedings by trustees of the owners assigned his interest in the lease to another by assignment reciting

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes